UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

SANTIAGO ALONSO VAZQUEZ, SALVADOR
SANTIAGO BACILIO, TELESFORO TORRES,
and JOSE GONZALEZ,                          **MEMORANDUM & ORDER**
                                            13-CV-6085(EK)(PK)
              Plaintiffs,

         -against-

142 KNICKERBOCKER ENTERPRISES,
CORP., d/b/a WOW CAR WASH; GEORGE
AUTO SPA, CORP.; MOCHA MANAGEMENT,
LLC; and MOSHE AZOULAY,

              Defendants.

------------------------------------x

ERIC KOMITEE, United States District Judge:

Four former employees of Wow Car Wash — Santiago
Alonso Vazquez, Salvador Santiago Bacilio, Telesforo Torres, and
Jose Gonzalez — brought this action in 2013.  They allege
violations of the Fair Labor Standards Act and the New York
Labor Law by Moshe Azoulay, who owned Wow Car Wash, as well as
three corporate entities through which he allegedly operated the
business.

The plaintiffs allege that Azoulay committed an
assortment of wage-and-hour violations during their time at the
car wash.  They allege that he failed to pay minimum wage and
overtime, to pay them for all hours worked, to pay spread-of-
hours wages, and to provide proper hiring and wage notices.
Plaintiffs also contend that Azoulay misappropriated their tips.

In addition, they allege that after they filed this lawsuit, Azoulay retaliated against them by reporting them to federal authorities.[1]

In 2018, Judge DeArcy Hall, who was then presiding, granted summary judgment to the plaintiffs on the spread-of-hours and notice claims and entered a partial judgment on those claims under Federal Rule of Civil Procedure 54(b).  ECF No. 102; ECF No. 118.  Azoulay appealed from that judgment, and the Second Circuit affirmed.  *Alonso Vazquez v. Azoulay*, 834 F. App'x 653, 655 (2d Cir. 2021).

Along the way the case was reassigned to me.  After the Second Circuit issued its mandate, I held a bench trial in October and November of 2022.  Six witnesses testified: Azoulay, each of the plaintiffs, and Thomas Power, an attorney who previously represented the plaintiffs in this litigation.  *See* Trial Tr., ECF Nos. 204–06, 208.[2]  Following the trial, the parties submitted post-trial briefing.

---

[1] Although the defendants previously were represented by counsel, they later terminated that representation.  Since 2014, Azoulay has been proceeding *pro se*.  Certificates of default have been entered against the corporate defendants, who cannot appear except through licensed counsel.  ECF No. 138.

[2] Citations to a name indicate testimony given by that witness at trial. "Tr." denotes non-testimonial portions of the trial record.

Having considered the evidence and the credibility of the witnesses, I make the following findings of fact and reach the following conclusions of law.

## I.  Findings of Fact

## A.  Plaintiffs' Employment at Wow Car Wash

### 1.  Periods of Employment

Wow Car Wash operated in Bushwick, Brooklyn, on Knickerbocker Avenue.  Torres 86:19-87:2.  The plaintiffs washed cars at Wow during various periods between 2007 and 2014 (discussed further below).  *See* ECF No. 197 at 3.  Torres also served as a cashier.  Torres 88:1-7.  The plaintiffs reported to the car wash's manager — first Carlos Calero, then Jose Calderon.  *See id.* at 95:10, 118:19-22.

Judge DeArcy Hall determined the plaintiffs' periods of employment to be the following: Vazquez worked from November 1, 2007 until April 2014; Bacilio from November 1, 2007 until August 2012; Torres from November 1, 2007 until December 2012, and then again from April 22, 2013, until October 2014; and Gonzalez from February 25, 2013 until July 6, 2013.  ECF No. 102 at 4.[3]  These determinations are consistent with the trial

---

[3] Vazquez, Torres, and Bacilio all testified at trial to start dates prior to November 1, 2007.  Vazquez 40:8-9 (2002); Torres 87:17-20 (2006); Bacilio 154:13-14 (March 2007).  However, this action was initiated on November 1, 2013, making November 1, 2007 the first day of the six-year limitations period on these plaintiffs' claims for lost wages and tips.  *See* NYLL § 663(3).

testimony and, having been affirmed by the Court of Appeals, constitute the law of the case.  ECF No. 197 at 4 (citing *United States v. Uccio*, 940 F.2d 753, 757 (2d Cir. 1991)).

     2.   <u>Evidence of the Plaintiffs' Hours and Pay</u>

     The parties introduced evidence of the plaintiffs' hours worked and pay received.  This evidence consisted of four sets of records (each kept by a different party) and the plaintiffs' testimony.

     a.   Azoulay's Records

     Azoulay kept at least some records of the plaintiffs' hours worked and compensation.  Exs. 16–20.[4]  The plaintiffs introduced these records at trial.  *See* Tr. 255:13, 266:19, 268:5 and 25, 269:21.  The records span from April 14, 2012 — almost five years into the period at issue — through the period's 2014 conclusion.  *See* Exs. 16–20.  Azoulay testified that he kept additional records, Azoulay 253:22–254:4, but no party offered Azoulay records from before April 14, 2012.

     When he kept these records, each week, Azoulay populated a grid with a row for each employee.  *See* Exs. 16–20.  In each row, Azoulay recorded the daily start and end times of the employee's shift.  Azoulay 256:18–258:8.  He also computed daily and weekly totals of hours worked.  *Id.* at 258:9–259:15.

---

[4] The plaintiffs' exhibits are numbered and Azoulay's exhibits are lettered.

In a "Total" column, he would then record the amount of pay that, according to Azoulay's testimony, the employee was "supposed to receive" for that week. *Id.* at 259:16-18. Employees were paid partly in cash and partly by check, and both categories comprised the "Total" amount. *Id.* at 259:19-25. In an adjoining "Tip" column, Azoulay also recorded the tips that the employee received for that week. *Id.* at 260:5-17.

> b.   Vazquez's Records

While working at the car wash, plaintiff Vazquez kept a log of his hours. Vazquez 42:23-24. He made these records every day, contemporaneously with the days he worked. *Id.* at 43:17-19. The plaintiffs introduced Vaquez's records from January 1, 2010 through November 11, 2013. *See* Ex. 1; Tr. 45:22. For each day, Vazquez recorded his start and end times and his hours worked. Vazquez 47:25-49:23. Generally, he would also record the tips he received that day. *Id.* at 50:4-9. He received some of his pay by cash and the remainder by check. *Id.* at 50:16-51:1, 52:10-19. He recorded the check and cash payments for each week separately. *Id.* at 50:16-51:1. Vazquez would also sum, for each week, the hours he worked and the tips he received. *Id.* at 49:24-50:3, 50:10-15. He did not, however, include the tip amounts in the cash or check figures that he recorded. *Id.* at 51:25-52:7.

c.   Torres's Records

Torres, too, kept a log of his hours worked at the car wash.  Torres 94:22-23.  The plaintiffs introduced Torres's records from December 24, 2011 through January 20, 2014.  *See* Tr. 98:21; Ex 9.  For each day, Torres recorded his start and end times and his total hours worked.  Torres 99:3-100:13; Ex. 9.

d.   Other Wage and Hour Records

Vazquez, Torres, and Bacilio all received paystubs, which were generated by a third-party payroll company called Paychex.  *See* Exs. 3-8, 11-15; *see also* Azoulay 523:2-5.  The plaintiffs introduced various paystubs dated from 2008 through 2013.  Tr. 89:25, 93:5, 159:4.  Both sides agree, however, that only part of these plaintiffs' pay was paid through Paychex, while the rest was paid in cash.  Vazquez 50:16-52:24; Torres 90:18-91:1; Bacilio 156:25-157:6; Azoulay 467:18-23.  The paystubs reflect only those hours of work for which they were paid through Paychex.  *See id.*

Azoulay also introduced a limited set of payroll records that Paychex maintained.  *See* Exs. A, B, Z; Tr. 485:23, 511:23, 515:25.  These records extend into 2015, beyond the period at issue.  *See* Exs. B, Z.  Where they cover the relevant period, they, like the paystubs, report only hours for which Paychex processed payment.  *See* Exs. A, B, Z.

e.   Plaintiffs' Testimony

In addition to the written records discussed above, each plaintiff testified to his ordinary schedule during at least certain periods at issue.  Vazquez testified that his 2007 through 2011 work schedule, with modest variations, was from 8:00 a.m. to 6:00 p.m., six days per week.  Vazquez 41:16–42:20. Torres testified to working from 8:00 a.m. or earlier until between 6:00 p.m. and 7:00 p.m. during the same period.  *See* Torres 94:4–13.  He added that he worked a total of fifty-eight to sixty hours per week.  *Id.* at 94:12–13.  And Bacilio testified to working during that same period from 8:00 a.m. to 7:00 p.m., six days a week.  Bacilio 155:10-17, 156:16-21. Finally, Gonzalez testified that from February 2013 to July 2013 — the entirety of his employment — he worked from 8:00 a.m. or earlier until 6:00 p.m., six days a week.  Gonzalez 211:6–12 and 21–25.

3.   Conflicts Among the Evidence of the Plaintiffs' Hours

To varying degrees, the three sets of handwritten records, the paystubs, and the plaintiffs' testimony conflict with one another.  Thus, determining the plaintiffs' hours requires weighing these conflicting data sources against each other.

a.   Inadequacy of Azoulay's Early Records

Where "an employer's records [of employee hours] are inaccurate or inadequate, an employee need only present sufficient evidence to show the amount and extent of the uncompensated work as a matter of just and reasonable inference." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).  Moreover, "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Id.*

Azoulay has not proven he kept adequate records prior to April 14, 2012, the earliest date of his handwritten records that were offered at trial.  Azoulay testified that he kept records prior to that date.  Azoulay 253:22–254:4. Nevertheless, the only earlier employment records offered at trial were from Paychex.  Those Paychex documents systematically under-reported the plaintiffs' hours by excluding hours for which each plaintiff was paid in cash.  As Azoulay testified, Wow "artificially reduc[ed] the number of hours that [it] told Paychex" each plaintiff worked.  *Id.* at 471:21–472:16.  As a result, these Paychex records inadequately document the plaintiffs' hours.

Accordingly, each plaintiff's work hours prior to April 14, 2012 may be "estimate[d] based on [that plaintiff's] own recollection." *Kuebel*, 643 F.3d at 362.  The same is true

for the "few weeks in Mr. Azoulay's records that the data was incomplete or missing or . . . illegible."  Power 372:9-11.

  b. Plaintiffs' Hours Before Azoulay's Records Begin

  As noted, Vazquez and Torres both maintained records of their own hours.  Separately, Vazquez and Torres also estimated their hours for an average week from 2007 to 2011.  Any conflict between the rough estimate and the exact daily totals in these plaintiffs' handwritten records is resolved in favor of the handwritten records.  These records determine Vazquez's and Torres's hours until Azoulay's records begin on April 14, 2012.

  Although Vazquez produced no records from before January 1, 2010, *see* Ex. 1, he testified that his hours were largely the same from 2007 to 2011.  Vazquez 41:16-18.  Thus, it is reasonable to estimate Vazquez's hours from 2007 to 2009 by extrapolating from the data from 2010 and 2011, the two most proximate years of data.  Other district courts applying *Kuebel* have made similar extrapolations from pay periods with data to periods without.  *See, e.g.*, *Aponte v. 5th Ave. Kings Fruit & Vegetables Corp.*, No. 20-CV-5625, 2022 WL 3655185, at *5-6 (E.D.N.Y. Aug. 25, 2022) (citing *Kuebel*, 643 F.3d at 362) (so extrapolating and collecting cases); *cf. Davis v. New York City Hous. Auth.*, 278 F.3d 64, 82 (2d Cir. 2002) (expert's "extrapolat[ing] data from a reasonable period" was

"permissible," and district court's "acceptance of his analysis" in findings of fact thus was not "clearly erroneous").

Because no witness testified that Vazquez maintained the same work schedule after 2011, and no document so suggests, the extrapolation will exclude 2012 through 2014 data from both Vazquez and Azoulay.

I therefore find that Vazquez worked, from 2007 to 2009, the same number of hours per week as reflected in the average of his 2010 and 2011 data.

The plaintiffs propose — as a reasonable estimate of Torres's hours prior to the beginning of Torres's records, and of Bacilio's hours prior the beginning of Azoulay's records — that I assume Torres and Bacilio worked the same hours as Vazquez. *See* Pls.' Post-Trial Br. 7–8, ECF No. 211; Pls.' Proposed Findings of Fact & Conclusions of Law ("Pls.' Findings & Conclusions") ¶¶ 41, 50, ECF No. 210.  Torres and Bacilio both testified to working as much as or more per week than Vazquez's records indicate Vazquez worked in 2010 and 2011. *See* Torres 94:4-13; Bacilio 155:10-17, 156:16-18.  Thus, it is reasonable (or even conservative) to estimate that Torres's and Bacilio's hours were the same as Vazquez's in those years, and to use Vazquez's records for the hours of all three of those plaintiffs.  It is similarly appropriate to estimate that Torres's and Bacilio's hours were the same as Vazquez's hours

from 2007 to 2009, the years in which my finding of Vazquez's hours is extrapolated from Vazquez's 2010 and 2011 records.

   c.   Plaintiffs' Hours Once Azoulay's Records Begin

       As there is no indication that the accuracy of the sets of records varies over time, the same records should prevail in every case of conflict.  The parties agree that Azoulay's records should control over both Vazquez's and Torres's for the periods when Azoulay's records are available (April 14, 2012 onward, with some gaps).  Azoulay stands by the accuracy of his records, citing them in his post-trial brief as "pro[of] the defendant did maintain records and that plaintiffs did receive their pay . . . as required under the law."  Def.'s Post-Trial Br. 2, ECF No. 214.  And the plaintiffs urge the finding that "Defendant's records for the time period from April 14, 2012 through July 2014 (Exs. 16-20) accurately reflect the hours worked by Plaintiffs, which was generally approximately 50 hours per week."  Pls.' Findings & Conclusions ¶ 18.  While the plaintiffs also include the caveat that Azoulay's records "do *not* reflect the approximately 15 minutes per day that Plaintiffs Torres, Bacilio, and Gonzalez [but not Vazquez] worked prior to 8:00 a.m., preparing the car wash for opening," *id.*, as discussed below, no plaintiff's records report work prior to 8:00 a.m., either.  Thus, the plaintiffs have urged reliance on

Azoulay's records over their own in all cases where they, in fact, conflict.

At summary judgment, Judge DeArcy Hall credited Azoulay's records over the plaintiffs' where they conflicted. Judge DeArcy Hall granted summary judgment to the plaintiffs on their claims under the NYLL that Azoulay failed to pay "spread-of-hours" wages — additional pay for any day's work that spans more than ten hours, inclusive of breaks. *See* ECF No. 102 at 3; ECF No. 118 at 10. In determining the number of days with a spread of hours greater than ten that Vazquez and Torres worked, Judge DeArcy Hall relied on Azoulay's records over the plaintiffs'. *See* ECF No. 118 at 4, 6. The Second Circuit affirmed. *See* ECF No. 197 at 4–5.

Given the above, I, too, find that Azoulay's records control.

Moreover, because Gonzalez worked for Wow during only 2013, Azoulay's records — and not Gonzalez's testimony — establish Gonzalez's hours during the bulk of his employment.

d.   Gaps in Azoulay's 2012 to 2014 Records

In addition, there are brief gaps in Azoulay's records after April 14, 2012. *See* Power 372:9-15; Exs. 16-20. These gaps fall exclusively during periods when Vazquez has records and overlap with certain periods when Torres has records. They fully postdate Bacilio's employment.

To fill these gaps, I find that Vazquez's hours during these gap periods are as reflected in Vazquez's records for those weeks.

Likewise, Torres's hours are as reflected in Torres's records when available.  However, when neither Azoulay's nor Torres's records are available, I cannot find that Torres has discharged his burden of showing he was underpaid.  Torres testified to his typical schedule only from 2007 to 2011.  *See* Torres 94:4-13.  Without equivalent testimony about 2012 to 2014, there is insufficient support for extrapolating from other data to predict Torres's hours during these later gap periods.

Lastly, because Gonzalez testified to a consistent work schedule of 8:00 a.m. to 6:00 p.m., six days per week during his employment, Gonzalez 211:6-12 and 21-25, his hours in the sole gap week during his tenure will be as he testified.  As Azoulay's records consistently report that Gonzalez took thirty-minute unpaid lunch breaks whenever he worked more than five hours, *see* Exs. 16-20, an 8:00 a.m. to 6:00 p.m. shift is 9.5 hours of paid work.

4.   The Plaintiffs' Pay

As with the plaintiffs' hours, there is no dispute that Azoulay's records establish how much each Plaintiff was paid beginning on April 14, 2012, through to the end of each plaintiff's employment at Wow Car Wash (except where there are

13

gaps).  *See* Pls.' Findings & Conclusions ¶ 19 ("Defendant's records for the time period from April 14, 2012 through July 2014 (Exs. 16-20) accurately reflect the wages Defendant paid to Plaintiffs."); *accord* Def.'s Post-Trial Br. 2.

The Paychex paystubs are also evidence of the plaintiffs' wages — even though, as discussed, they misrepresent the plaintiffs' hours.  *See, e.g.*, Torres 93:8-12 (confirming accuracy of wage listed on July 2011 paystub); Bacilio 159:6-14 (confirming accuracy of wage listed on February 2008 paystub).

a.   Gonzalez's Pay

Because Gonzalez worked for Wow during only 2013, Azoulay's records establish Gonzalez's pay during the bulk of his employment.  For the week in which Azoulay lacks records of Gonzalez's pay, Gonzalez's pay rate was as he testified: $6.50 per hour.  Gonzalez 210:23-211:2.

b.   Vazquez's Pay

For the same reasons as to hours, Vazquez's records establish how much he was paid each week beginning on January 1, 2010, until Azoulay's records become available in April 2012, and during the gaps in Azoulay's records thereafter.[5]  Just as Vazquez's 2007 to 2009 hours are extrapolated from his 2010 and

---

[5] There are about half a dozen exceptions where Vazquez did not record this information.  In these cases, the plaintiffs have proposed extrapolating from "pay amount[s] from a different week" within Vazquez's records "with comparable hours."  Pls.' Letter 2, ECF No. 202.  I adopt this approach.

2011 records, so, too, is his hourly pay (total 2010 and 2011 recorded pay, inclusive of any overtime, divided by total 2010 and 2011 recorded hours).

      c.   Bacilio's Pay

As confirmed both by Bacilio's testimony and the Paychex paystubs, Bacilio received $6.50 per hour throughout his employment at Wow Car Wash.  Bacilio 159:16-24 (Bacilio's testimony); Exs. 11-15 (Paychex paystubs).

There are no records of how much Bacilio was paid in total per week.  *See* Power 401:7-11.  However, multiplying his pay rate — $6.50 per hour — by his estimated number of hours worked per week yields a reliable calculation of Bacilio's weekly pay.  *Accord id.* at 401:12-15 (proposing this methodology).

      d.   Torres's Pay

Torres was paid $5.50 per hour in 2007.  *See* Torres 88:8-10, 88:16-19.  His pay was increased to $6.50 in 2008.  *Id.* at 88:16-19.  The record does not reflect when in 2008 his pay increased.  As a plaintiff bears the burden of "prov[ing] that he has in fact performed work for which he was improperly compensated," *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946), that pay increase will be dated to the earliest possible date — January 1, 2008.

At the "end of 2011," Torres's hourly rate of pay was increased again.  Torres 93:17–18; 150:3–4; *see also* Ex. 6 at P000154–55. Specifically, as reflected in Torres's pay stubs, beginning on August 20, 2011, his hourly wage increased from $6.50 to $7.25.  S*ee* Ex. 6 at P000154–155; *see also* Exs. 7–8. Disputing the documentary record in part, Torres testified that this pay increase was to only $7.15.  *See* Torres 150:3–4.  But because Torres "bears the burden of proving he was not adequately compensated," *Williams v. Epic Sec. Corp.*, 358 F. Supp. 3d 284, 301 (S.D.N.Y. 2019), he must provide some reason to credit his testimony over the contemporaneous paystubs.  Yet the plaintiffs offer no basis for crediting Torres's testimony over the documentary record, arguing only that Torres's "testimony is broadly consistent with the paystubs."  Pls.' Post-Trial Br. At 9–10.  Moreover, Torres himself testified that as of July 2011 — immediately before the pay increase — Paychex's paystubs were accurate as to his wage.  *See* Torres 93:8–12.  Thus, the court concludes that Torres was paid $7.25, rather than $7.15, from the end of 2011.

5.   <u>Work Prior to 8:00 a.m.</u>

Notwithstanding certain testimony to the contrary, the court finds that the plaintiffs began work at 8:00 a.m. each day.

That is when the car wash opened.  Three plaintiffs
and Azoulay testified that the car wash opened at 8:00 a.m.
every morning.  Vazquez 41:24-42:1; Torres 94:9-10; Gonzalez
211:9-10; Azoulay 452:10-12.  Bacilio testified, however, that
it "usually open[ed]" "[b]efore 8:00," at "like 7:45 or 7:50."
Bacilio 155:13-14.  It is not apparent whether Bacilio meant the
car wash opened for business before 8:00 or merely opened its
doors to employees.  To the extent Bacilio meant the former,
given the consistency of the other witnesses' testimony, I
cannot credit his testimony on this point.

Nevertheless, three of the plaintiffs — Torres,
Bacilio, and Gonzalez — testified that they were required to
arrive before the car wash opened to complete preparatory work,
and that Azoulay did not pay them for that time.

Torres testified that a manager, Calero, gave him the
keys to the car wash, and that Torres "would come into work 15
minutes early" to "open[] up."  Torres 94:5-8, 95:7-12.  Torres
testified that he was told to arrive 15 minutes early "to take
care of the gates, that is, the curtain," so the car wash could
begin providing services at 8:00 a.m.  *Id.* at 94:8-10.

Similarly, Bacilio testified that when he had a shift
that started at 8:00 a.m., he arrived at the car wash "[b]efore
8:00," at "[l]ike ten to 8:00," at the direction of "Carlos"
(presumably Calero).  Bacilio 155:10-22.  He explained that he

arrived before 8:00 a.m. "[t]o help out in the opening, to take out the stuff, whatever was necessary," and to "[o]pen up . . . the curtains, the gates, just that type of stuff." *Id.* at 155:23–156:3. The car wash had two gates: an electrically powered gate and another that had to be pulled open by hand. Azoulay 453:23–454:1.

Gonzalez testified that during his employment, he arrived "15 minutes before" 8:00 a.m. at the instruction of Jose Calderon, the manager. Gonzalez 211:9–16. His responsibilities during that time "were to open and to prepare the utensils, the soaps and brushes in order to start work." *Id.* at 211:17–20.

However, Torres's, Bacilio's, and Gonzalez's testimony on this score was not credible. The plaintiffs did not describe work that would require a total of thirty minutes or more of their collective time. Moreover, all sets of the time records — even those prepared by the plaintiffs — report start times of 8:00 a.m. or later. *See* Ex. 1 (Vazquez's records); Ex. 9 (Torres's records); Ex. 16–20 (Azoulay's records).

In addition, Azoulay persuasively testified that the car wash staff did not have responsibilities prior to 8:00 a.m. As Azoulay testified, Wow Car Wash provided car washes by hand (without using mechanical brushes). Azoulay 452:23–453:15. Azoulay explained that this allowed for much of the preparation for opening to be performed the previous day. *Id.* at 452:16–

452:23.  Moreover, he explained, only three things were needed to start an actual car wash: "[t]he bucket with the brushes, the high pressure gun, and the broom."  *Id.* at 454:20–22.  Azoulay testified that preparation of these "shouldn't [have] taken . . . more than 25 seconds" and could be completed while the customer was opening the trunk of his or her car and removing his or her belongings.  *Id.* at 454:16–24.  The only other steps required to open the car wash were opening the electrically powered gate and pulling open the second gate by hand.  *Id.* at 453:23–454:1.  And Azoulay testified that he often opened the electric gate himself.  *Id.* at 480:17–21.  Azoulay explained that he was on site to do so because from "around 2008" through when the car wash closed in 2015, the car wash was his "house"; he had no home in New York and was living at the car wash "[m]ost of the time" that he was in the state.  *See id.* at 453:23–454:11; *see also id.* at 637:21–22, 644:16–645:2.

In sum, the plaintiffs have not shown that they performed off-the-clock work prior to 8:00 a.m.

6.   The Car Wash's Tip-Sharing Practices

During the plaintiffs' employment, customers would routinely leave tips for the workers in small metal boxes at the store entrance and exit.  Torres 102:21–103:2.  Customers also occasionally gave tips directly to a worker, who was then required to put it in one of those boxes.  *Id.* at 103:3–8.

At the end of each day, the workers would gather, and one of them — usually Torres — would open the metal boxes. *Id.* at 103:15–25, 108:25–109:2, 110:8–10. The money would be counted, and the tips would be divided and distributed on the spot. *Id.* at 103:15–25.

As discussed below, New York forbids an "employer or his agent" from sharing in customer-service employees' tips, or requiring those employees to share tips with "employees who do not perform direct customer service" or "managers." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011) (quoting NYLL § 196-d).

At Wow, "[t]hose . . . who washed the cars, the cashiers, the manager, and Moshe, the owner" (i.e., Azoulay) all participated in the tip pool. Torres 104:1–4.

The cashier position was customer-facing. *See id.* at 142:21–143:1. For example, some cashiers would "assist customers in the store," and even those who could not assist customers would "r[i]ng them up." *See id.* Some, but not all, cashiers also washed cars. *See id.* at 109:25–110:5, 153:5–7; *see also* Azoulay 457:18–458:11.

Azoulay not only shared in the tips, but also "would be counted as two people" in the division of tips. Torres 104:5–10. Torres testified that Azoulay would insist that "he needed the money to buy the towels for drying the cars." *Id.* at

104:11-12.  Torres, when he had the job of splitting the tips, would put Azoulay's two shares into an envelope for him.  *Id.* at 105:9-21.  A number of these envelopes were received into evidence.  Ex. 58.

At trial, Azoulay denied retaining tips for towels. Azoulay 616:9-617:4.  He did, however, testify that the car wash continually replaced towels not only because they would wear out, but because employees — with Azoulay's blessing — sold the towels (and water bottles) to customers and kept the money for themselves.  *See id.* at 459:6-461:6.

Azoulay's denial was not credible.  It contradicted Azoulay's prior deposition testimony.  *See id.* at 614:21-6:16:8. And when he was impeached with the prior testimony, Azoulay failed to explain the discrepancy.  *See id.* at 616:9-617:6. Accordingly, I find that Azoulay retained two shares of tips.

**B.  Azoulay's Conduct After Initiation of this Suit**

The plaintiffs contend that after the initiation of this suit, Azoulay took several actions adverse to the plaintiffs in retaliation for their prosecution of this case. *See* Pls.' Findings & Conclusions ¶¶ 67-80.  In particular, the plaintiffs assert that Azoulay reported the plaintiffs to government agencies in a bid to have them drop this suit.  *See id.*

1. <u>Visit to the IRS</u>

The plaintiffs contend that Azoulay "identified Plaintiffs to an agent of the Internal Revenue Service" for "no legitimate business reason."  *Id.* ¶ 73.

Azoulay acknowledged that he visited an office of the Internal Revenue Service after the commencement of this suit. *See* Azoulay 295:13-24.  Azoulay testified that he made this visit not out of any retaliatory motive, but because he was not "sure that the people suing [him] were actually the same as those [he] had employed."  *Id.* at 299:21-300:17; *see also id.* at 312:6-10.  Thus, he testified, he wanted to obtain the plaintiffs' Social Security numbers "to match with the payroll." *Id.* at 299:21-300:17 and 24-25.

At the IRS office, Azoulay testified, he asked an IRS agent "if he can get me information on . . . these workers," i.e. the four plaintiffs.  *Id.* at 299:3-6.  Azoulay showed the IRS agent a document with Bacilio's name on it and asked the agent whether "this is a real document."  *Id.* at 307:9-13.  At trial, Azoulay could not recall what document he showed, but he testified that it contained Bacilio's name and a Social Security Number.  *Id.* at 313:14-19.  According to Azoulay, the agent replied that the document was "fraudulent" and included a "false Social Security number."  *Id.* at 307:17-18, 312:21.  And he told

Azoulay to "go to the FBI," as "[i]t's identity theft."  *Id.* at 313:12–13.

Azoulay's explanation of his purpose was not credible. Azoulay worked with Bacilio for many years, Bacilio 162:8–14, including years when Azoulay was living in the carwash.  *See* Azoulay 454:2–8.  That belies Azoulay's claim that he did not recognize Bacilio by name as a former employee and needed to provide Bacilio's papers to the IRS.  Moreover, Azoulay introduced no evidence of any basis he might have had for doubting whether any of the plaintiffs were, in fact, his employees.

I find that Azoulay identified the plaintiffs to an IRS agent for no legitimate business reason. I further find that he did so because of the filing of this lawsuit, and that he would not have done so but for such filing.

2.  Azoulay's 2015 Filing in this Case

In addition to visiting the IRS, in 2015, Azoulay filed a letter in this case addressed to the Honorable Sandra L. Townes and the Honorable Viktor V. Pohorelsky, the district judge and magistrate judge then presiding.  Ex. 21; ECF No. 46 (same); *see also* Azoulay 278:14–15.  In the letter, Azoulay accused the plaintiffs of committing various crimes, including identity fraud and immigration violations.  *See* Ex. 21.  I find that this letter was a threat to subject the plaintiffs to legal

jeopardy, filed to pressure the plaintiffs into abandoning this suit.

Among other things, the letter stated: "**A complaint was filed with the social security administration against MR, Basilo** [sic] **(please, see the attached email)**." The "attached email" consisted of a block of text immediately below this sentence that appears to have been copied and pasted from another source. The text read, in part:

> Date: 13 Dec 2014 19:58:07 -0500
> Subject: Re: your message
>
> Social Security Administration
> Office of the Inspector General
> Allegation Management and Fugitive Enforcement
> Division
>
> The purpose of this letter is to advise you that we received your allegation of potential fraud, waste and/or abuse in Social Security Administration programs. Thank you for taking the time to send us your report.

The webpage, mailing address, fax number, and phone number of the SSA's Office of the Inspector General were also appended. The email was signed "Director, Allegation Management and Fugitive Enforcement Division."

In addition, Azoulay's letter to the court also stated:

> **A complaint was made to the Attorney General on January 15 2015 and was noted by Jane pride** [sic]**.**
>
> **Also on January 15 2015 I did notify Miss Debby at the FBI office located on 26 federal Plaza NY.**

Ex. 21 at 5.[6]

At trial, in explaining this letter, Azoulay denied having ever complained about the plaintiffs to the SSA.  Azoulay 273:23–274:11.  He acknowledged having complained to the New York Attorney General's office, but testified that he complained solely about suffering a "human rights" violation when he was "denied . . . a jury trial" in this case.  *Id.* at 280:8-23.  He also acknowledged that he called the FBI.  *Id.* at 301:9-17.  He testified that he told the FBI that the IRS had instructed him to "file a complaint for . . . fraud," and that he explained to the FBI "what's going on, what happened here."  *Id.* at 301:17-20.  However, he denied ever identifying any plaintiffs to the FBI by name.  *Id.* at 307:8-10, 308:3-7.

As discussed below, it is immaterial to my conclusions of law whether Azoulay, in fact, made any of these complaints, or merely conveyed to the plaintiffs that he had done so.

---

[6] Azoulay did not clarify at trial which Attorney General's office he was invoking, but he has previously indicated in this case that it was the New York Attorney General's office.  *See* March 13, 2018 Hr'g Tr. 62:10-17, ECF No. 158.  Additionally, while the record does not indicate to whom "Jane Pride" refers, the court takes judicial notice of a LinkedIn profile for a "Jane Pride," an "Administrative Secretary" at the New York Attorney General's office.  *See Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio*, 364 F. Supp. 3d 253, 263 (S.D.N.Y.) (citing Fed. R. Evid. 201(b)(2)) (taking judicial notice of fact that social media posts were made), *aff'd*, 788 F. App'x 85 (2d Cir. 2019).

### 3.    <u>Azoulay's 2015 Email to the Plaintiffs</u>

A few weeks later, on March 1, 2015, Azoulay emailed Elizabeth Koo, a law student who was then part of the plaintiffs' legal team.  Ex. 23.  Azoulay complained of not receiving a fair trial and of suffering "great losses" because of this case.  *Id.*  He stated, "I highly suggest that we all drop our charges against each other make peace and go on with our lives, but not before we settle the bill with Sima Ali" (his former lawyer in this action).  *Id.*  Azoulay confirmed the email's authenticity.  Azoulay 285:8–13.  Azoulay also agreed that the email amounted to "proposing that [he] would withdraw [his] complaints against the plaintiff in exchange for withdraw[al] of the federal case."  *Id.* at 285:14–17.  I adopt these admissions as findings.

## II.  Conclusions of Law

The plaintiffs assert several claims against Azoulay.[7] They claim Azoulay: (1) paid them below minimum wage; (2) denied them overtime pay; (3) misappropriated their tips; and (4) undercounted their hours.  They also claim that Azoulay then retaliated against them for filing this lawsuit.

---

[7] Judge DeArcy Hall has previously granted the plaintiffs summary judgment on their spread-of-hour and notice claims.  Additionally, during trial, the plaintiffs relinquished their federal minimum wage and overtime claims.  Tr. 489:13–16.

**A.   Azoulay was the Plaintiffs' Employer**

The plaintiffs' claims under both the Fair Labor Standards Act and the New York Labor Law may succeed only if Azoulay was their "employer" within the meaning of both laws. *See* 29 U.S.C. § 216(b); NYLL § 663(1).  "The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013).[8] Given that, "the weight of authority among district courts in this Circuit" is that the test for "employer" status is the same under the NYLL and FLSA. *See id.*

Here, it is law of the case that Azoulay was an employer for purposes of the NYLL.  Judge DeArcy Hall granted summary judgment to the plaintiffs on their NYLL claim that they had not been paid spread-of-hours pay.  *See* ECF No. 102 at 3. An element of that claim, too, was that Azoulay was the plaintiffs' employer.  *See Pachter v. Bernard Hodes Grp., Inc.*, 891 N.E.2d 279, 282 (2008); *see also Guadalupe v. Tri-State Emp., Mgmt. & Consulting, Inc.*, No. 10-CV-3840, 2013 WL 4547242, at *7 (E.D.N.Y. Aug. 28, 2013).  The Second Circuit has affirmed that determination. *Alonso Vazquez*, 834 F. App'x at 654.  "[A]

---

[8] Unless otherwise noted, when quoting judicial decisions, this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

trial court is barred from reconsidering or modifying any of its prior decisions that have been ruled on by the court of appeals." *United States v. Uccio*, 940 F.2d 753, 757 (2d Cir. 1991). Consequently, Azoulay was the plaintiffs' "employer" under the NYLL. And, under the law of this circuit, he was their employer under the FLSA as well. *See Hart*, 967 F. Supp. 2d at 940. Azoulay admits that he was the plaintiffs' employer. *See* Am. Answer ¶ 12, ECF No. 79.

## B.  Azoulay Underpaid the Plaintiffs

While Plaintiffs worked at Wow Car Wash, the New York minimum wage changed twice. The rate was $7.15 per hour from the beginning of the period at issue — November 1, 2007 — until July 23, 2009; $7.25 per hour from July 24, 2009 through December 30, 2013; and $8.00 per hour beginning December 31, 2013. *See* NYLL § 652; N.Y. Comp. Codes R. & Regs., tit. 12 § 142-2.1 (2013); N.Y. Comp. Codes R. & Regs., tit. 12 § 142-2.1 (2009); N.Y. Comp. Codes R. & Regs., tit. 12 § 142-2.1 (2005).

The NYLL provides that "[i]f any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she shall recover in a civil action the amount of any such underpayments . . . ." NYLL § 663.

New York law required Azoulay to pay the plaintiffs more than he did. Specifically, as explained further below,

Azoulay was required to pay the plaintiffs minimum wage, excluding tips, as well as overtime, but he did not.

1.   <u>Azoulay Was Not Permitted to Deduct a Tip Credit</u>

An employer subject to the FLSA and NYLL is required to pay its employees at least the minimum wage for every hour worked.  *See* 29 U.S.C. § 206; NYLL § 652(1); N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.1(a).  Where the state minimum wage exceeds the federal minimum wage, the FLSA does not excuse employers from paying the higher state minimum.  *See* 29 U.S.C. § 218(a).

However, the NYLL "permit[s] an employer to pay a tipped worker a cash wage that is lower than the statutory minimum wage, provided that the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage." *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 500 (S.D.N.Y. 2017), *aff'd*, 752 F. App'x 33 (2d Cir. 2018).  "This allowance against the minimum cash wage is known as a 'tip credit.'" *Id.*[9]

Here, Azoulay was not entitled to take this tip credit because he failed to provide the requisite written notice to his employees.  The regulations permitting employers to take a tip

---

[9] The FLSA also has a tip credit provision.  29 U.S.C. § 203; *see* 29 C.F.R. § 531.59(b).  However, the FLSA does not excuse Azoulay from paying any higher state minimum wage.  *See* 29 U.S.C. § 218(a).  Azoulay thus may not take a federal tip credit against the minimum wage if state law forbids it.

credit against the minimum wage state that "[a]n employer may take a credit towards the basic minimum hourly rate if a service employee . . . receives enough tips and if the employee has been notified of the tip credit as required in section 146-2.2 of this Part."  N.Y. Comp. Codes R. & Regs. Tit. 12, § 146-1.3.  Before an employer may take the tip credit, "the NYLL requires an employer to 'give each employee written notice of the amount of tip credit, if any, to be taken from the basic minimum hourly rate.'"  *Chichinadze v. BG Bar Inc.*, 517 F. Supp. 3d 240, 254 (S.D.N.Y. 2021) (quoting  N.Y. Comp. Codes R. & Regs. tit. 12, § 146-2.2(a)).  The burden is on the employer to "prov[e] compliance" with the NYLL's notice requirement.  N.Y. Comp. Codes R. & Regs. Tit. 12, § 146-2.2.  "An employer who fails to provide the required notice is liable for the difference between the full minimum wage rate and what the employee was actually paid."  *Salustio v. 106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 554 (S.D.N.Y. 2017).

Azoulay produced no evidence to suggest that he complied with these notice requirements.  The only pre-employment notice in the record is a document titled "Worker responsibility and personal guarantee."  Ex. 25.[10]  Azoulay asked

---

[10] The transcript identifies this exhibit first as "Plaintiff's Exhibit 25 for identification" but then as the trial's second "Exhibit 5."  Tr. 617:10, 619:7.

workers to sign this document.  *See* Ex. YY (copy of the form signed by Torres).

The document states that "[i]t is the worker [sic] responsibility to declare for all tip and moneys paid over the minimum wages" and asks the worker to attest that "I am aware that all tips belong to the company and will be collected and used at they [sic] discretion."  *Id.* at 3.  This document does not give notice that tips will be deducted from the minimum wage.

In sum, Azoulay has not complied with New York's notice requirements for taking a tip credit.  As a result, Azoulay is liable for the entirety of the plaintiffs' minimum wages.  *See Salustio*, 264 F. Supp. 3d at 554.

2.   Azoulay Failed to Pay Minimum Wage and Overtime

As noted, New York law requires an employer to pay employees at least the minimum wage.  New York law also requires an employer to pay "time-and-a-half" overtime compensation — one-and-one-half times the employee's usual rate of pay for each hour an employee works over forty hours per week.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.  As Azoulay's records, the plaintiffs' records, and the plaintiffs' testimony uniformly demonstrate, Azoulay did not satisfy these obligations — he regularly paid less than minimum wage and withheld time-and-a-half pay.

C.   **Azoulay Misappropriated the Plaintiffs' Tips**

The NYLL "bars employers from requiring tipped employees to share tips with employees who do not perform direct customer service — *i.e.*, employees who are not 'busboys or similar employees' [-] and employees who are managers or 'agents' of the employer." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 240 (2d Cir. 2011) (quoting NYLL § 196-d).

Tip-eligible employees include those who are "ordinarily engaged in personal customer service." *Barenboim v. Starbucks Corp.*, 995 N.E.2d 153, 159 (N.Y. 2013).

1.   Because Azoulay and His Managers Exercised Significant Authority and Control, They Were Ineligible For Tip-Sharing

Azoulay and his managers were not tip eligible under the NYLL because they exercised meaningful authority at Wow.  In *Barenboim*, the New York Court of Appeals addressed the situations under which an employee's "managerial authority" would render him ineligible for tip sharing under Section 196-d. The court concluded "that the line should be drawn at meaningful or significant authority or control over subordinates." *Barenboim*, 995 N.E.2d at 160.  Such authority might include, for example, "the ability to discipline subordinates, assist in performance evaluations or participate in the process of hiring or terminating employees." *Id.*  It also might include influence

over employees' ultimate compensation.  *See id.*  An employee exercising this degree of managerial authority "is not eligible to participate in a tip pool" — even when "personal service to patrons is a principal or regular part of his or her duties." *Id.*

Azoulay plainly exercised such authority in the car wash.  He owned the operation.  Azoulay 252:20-22.  In that capacity, he hired Vazquez, Vazquez 40:10-14, and fired Gonzalez.  Am. Answer ¶ 38.  Azoulay also set employees' pay: he wrote the "personal guarantee" form that he had his employees sign and that asserted that each employee would be paid only the minimum wage.  Azoulay 617:16-18.  Thus, Azoulay was ineligible to participate in the tip pool.

Neither of the two managers, Calderon and Calero, was tip-eligible, either, as they both exercised meaningful authority over the plaintiffs.

As to Calero, Azoulay admits that he "was a manager." Am. Answer ¶ 36.  And the plaintiffs' testimony corroborates that: Calero told Bacilio when to show up to work, Bacilio 155:21-22; hired Torres, Torres 117:2-4; and directed Torres each day to apportion two tip shares to Azoulay.  Torres 104:13-105:7.

As to Calderon, Azoulay resisted the suggestion that Calderon ever had the title of "manager."  *See* Azoulay 456:18-

457:4.  Nevertheless, Calderon, like Calero, exercised meaningful managerial authority.  Per Torres, when Calero left, Calderon "ended up in charge of the car wash."  Torres 118:20–22.  Gonzalez testified that Calderon was, indeed, Wow's "manager."  211:15–16.  Calderon hired Gonzalez, *id.* at 220:19–22; told Gonzalez when to show up for work, *id.* at 211:13–14; and logged Gonzalez's hours for payroll.  *See id.* at 249:2–5.

In sum, Azoulay, Calero, and Calderon were all disqualified from participating in the tip pool.  Thus, three shares of tips were appropriated each day from the tip pool: two for Azoulay, and one for the manager.

2.  Azoulay Was Not Entitled to Deduct Tips for Business Expenses

As discussed, at trial, Azoulay defended his participation in the tip-sharing on the grounds that the money went to replenishing towels and bottles, including some that he allowed the plaintiffs to sell.  That defense fails.

New York law prohibited Azoulay from appropriating workers' tips for business expenses.  As noted, Section 196-d contains a blanket prohibition on employers' accepting or retaining "any part of a gratuity or of any charge purported to be a gratuity for an employee."  No exception is made for covering the costs of products that an employee is permitted to resell.

For the above reasons, Azoulay is liable for the misappropriation of three shares of tips for every day that a plaintiff worked.

3.   <u>Non-Manager Cashiers Were Tip-Eligible</u>

The plaintiffs have additionally argued that cashiers who did not wash cars should not have shared in the tipping pool.  *See* Pls.' Post-Trial Br. 15.  Because the cashier's role itself entailed "direct customer service," *Shahriar*, 659 F.3d at 240, this argument is unavailing.

**D.  Azoulay Retaliated Against the Plaintiffs for Filing This Case**

The FLSA and NYLL both prohibit employers from retaliating against employees for filing a lawsuit to enforce their rights under those statutes.  *See* 29 U.S.C. § 215(a)(3); NYLL § 215(1)(a).  The anti-retaliation provisions of the FLSA and the NYLL "are nearly identical." *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 471 n.18 (S.D.N.Y. 2008); *see also Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 304 (S.D.N.Y. 2011).  As a result, "[c]ourts commonly treat FLSA claims for retaliation and NYLL claims for retaliation identically." *Medina v. Ricardos Mech., Inc.*, No. 16-CV-1407, 2018 WL 3973007, at *8 (E.D.N.Y. Aug. 20, 2018) (collecting cases).  "FLSA and NYLL retaliation claims are analyzed using the same three-step burden shifting

framework . . . ." *Tortorici v. Bus-Tev, LLC*, No. 17-CV-7507, 2021 WL 4177209, at *11 (S.D.N.Y. Sept. 14, 2021).

First, "to establish a *prima facie* case of retaliation, a plaintiff must show participation in protected activity known to the defendant, an employment action disadvantaging the [plaintiff], and a causal connection between the protected activity and the adverse employment action." *Solis v. SCA Rest. Corp.*, 938 F. Supp. 2d 380, 398 (E.D.N.Y. 2013). "An employment action disadvantages an employee if it well might have dissuaded a reasonable worker from making or supporting similar charges." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "[C]ontext matters"; "alleged acts of retaliation must be evaluated both separately and in the aggregate, as even trivial acts may take on greater significance when they are viewed as part of a larger course of conduct." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 25 (2d Cir. 2014).

Second, if the plaintiff establishes the *prima facie* case, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the employment action." *Velazquez v. Yoh Servs., LLC*, 803 F. App'x 515, 517 (2d Cir. 2020) (citing *Mullins*, 626 F.3d at 53).

Third, if the defendant does so, "the plaintiff must then produce sufficient evidence to permit a reasonable juror to find that the defendant's proffered explanation was pretextual, and that more likely than not, retaliation was the real reason for the employment action." *Id.* (citing *Mullins*, 626 F.3d at 53–54).

It is settled that an employer can be liable for retaliation that occurs after a plaintiff's employment has ended. *See Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 509 (S.D.N.Y. 2013); *cf. Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). In *Robinson*, a unanimous Supreme Court held that Title VII's antiretaliation provision covered former employees. *See id.* The Court explained that "it would be destructive of [a] purpose of the antiretaliation provision for an employer to be able to retaliate with impunity against" plaintiffs the defendant first terminated. *See id.*

The Second Circuit applies the same standard for retaliation under the FLSA as it does under Title VII. *See Mullins*, 626 F.3d at 53. Accordingly, courts in this circuit have extended *Robinson*'s holding to the FLSA retaliation context. *See, e.g.*, *Li v. Oliver King Enters., Inc.*, No. 14-CV-9293, 2015 WL 4643145, at *3 (S.D.N.Y. Aug. 4, 2015) (collecting cases). Multiple courts have found FLSA retaliation when a former employer "threaten[s] immigration related consequences."

*See Walsh v. Ip*, No. 22-CV-00886, 2023 WL 3377629, at *3 (N.D.N.Y. May 11, 2023); *see also Porter v. MooreGroup Corp.*, No. 17-CV-7405, 2020 WL 32434, at *11 (E.D.N.Y. Jan. 2, 2020) (collecting cases).  In cases of retaliation against former employees, "the category of conduct that constitutes actionable retaliation includes more than just adverse employment actions or ultimate employment decisions."  *Torres v. Gristede's Operating Corp.*, 628 F. Supp. 2d 447, 472 (S.D.N.Y. 2008).

Here, the plaintiffs filed a lawsuit against Azoulay based on the FLSA and the NYLL.  "[T]he filing of a [wage-and-hour] lawsuit . . . is a protected activity."  *Mullins*, 626 F.3d at 53 (FLSA); *accord Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020) (NYLL).  That activity was "known" to Azoulay, who learned about the lawsuit shortly after it was filed in 2013.  Azoulay 425:16-24.

Azoulay then engaged in action "disadvantaging the person engaged in the protected activity."  *Solis*, 938 F. Supp. 2d at 398.  Specifically, Azoulay visited the IRS and reported the plaintiffs for possible falsified documents.  And he filed a letter with the court strongly suggesting that he had reported the plaintiffs to the IRS and three other government agencies — the FBI, the New York Attorney General's office, and the Social Security Administration — for immigration violations and other crimes.  Moreover, he offered to "withdraw [his] complaints

against the plaintiff in exchange for withdraw[al] of the federal case."  Azoulay 285:14–17.

In context, and in the aggregate, *see Rivera*, 743 F.3d at 25, the threat of Azoulay's cooperation with government agencies to prosecute the plaintiffs for various alleged crimes "well might have dissuaded a reasonable worker from making or supporting similar charges" against Azoulay and Wow.  *Mullins*, 626 F.3d at 53.  Courts in this circuit have recognized similar activity as retaliation.  For example, in *Centeno-Bernuy v. Perry*, 302 F. Supp. 2d 128, 136 (W.D.N.Y. 2003), the court held that "reporting plaintiffs to the [U.S. Immigration and Naturalization Service] and making baseless allegations to the government that plaintiffs are terrorists[] constitute[d] an adverse employment action."  *See also Walsh v. Ip*, No. 22-CV-00886, 2023 WL 3377629, at *3 (N.D.N.Y. May 11, 2023) (same for reporting former employees to U.S. Immigration and Customs Enforcement).

Furthermore, the Second Circuit has stressed that the FLSA also prohibits "threats of retaliation" and "efforts to obtain withdrawal of FLSA claims by threats of retaliation." *Soler v. G & U, Inc.*, 690 F.2d 301, 302–03 (2d Cir. 1982). Accordingly, Azoulay's representing he had live complaints with multiple government agencies, and his offer to withdraw such complaints if the plaintiffs discontinued the case, constituted

retaliation — whether or not Azoulay ever lodged those complaints.

Plaintiffs have therefore established a *prima facie* case of retaliation.

Azoulay has not "articulate[d] a legitimate, non-discriminatory reason" for his actions. *Solis*, 938 F. Supp. 2d at 398.  He maintains he never reported the plaintiffs to the SSA, so he has not attempted to justify such a report.  And because he maintains that he made no such report, he cannot justify his assertion to the contrary in a court filing.

As to the IRS meeting, the only reason that Azoulay has given for making that visit was that he wanted to verify whether the Plaintiffs had actually been his employees — an explanation that I have rejected.

Thus, the plaintiffs prevail on their NYLL and FLSA retaliation claims.

**E.   Remedies**

1.   <u>Damages from Employment at Wow Car Wash</u>

a.   Compensatory Damages

"The measure of damages in a[n] . . . NYLL case is the amount the plaintiff should have been paid minus the amount the plaintiff was actually paid." *Zabrodin v. Silk 222, Inc.*, No. 22-CV-7064, 2023 WL 8009319, at *11 (E.D.N.Y. Nov. 20, 2023).

The plaintiffs are awarded as damages the total of their unpaid wages, unpaid overtime, and misappropriated tips. The plaintiffs' hours for which they are entitled to compensation and the partial pay they have already received are as detailed in the above findings of fact.

As to tip misappropriation specifically, damages shall be calculated as follows:

First, Azoulay's records contain, for most days that they cover, the daily tip share. *See* Exs. 16–20.  Those records also list the employees who received tips that day (aside from Azoulay and the manager, who are never listed).  *See id.* Multiplying the daily tip share by three results in the amount of tips misappropriated that day (two for Azoulay, one for the manager).  Dividing that number by the number of employees properly entitled to tips yields each of those employees' damages for that day.

For example, on October 20, 2012, eight non-managerial employees received $15 in tips each.  Ex. 16 at 7–8.  This means that each tip share was $15, so $45 of tips was misappropriated. Each employee's damages for that misappropriation were therefore $45 / 8 = $5.63.

Averaging these tips over all the days for which data is available yields a reasonable estimate of the tip shortfall per employee per day.  Multiplying this number by the number of

days worked (or estimated to have been worked) by each plaintiff at Wow Car Wash produces a reasonable estimate of each plaintiff's damages from Azoulay's tip misappropriation.

      b.   Liquidated Damages

Under the NYLL, a plaintiff prevailing on an unpaid wages claim is entitled to recover liquidated damages "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." NYLL §§ 198(1-a), 663(1). The burden for establishing a good faith basis here is substantially the same as that under the FLSA. *See Inclan v. N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015). In the FLSA context, good faith "requires more than ignorance of the prevailing law or uncertainty about its development." *See Reich v. S. New Eng. Telecomms. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997)

Prior to April 9, 2011, New York law provided liquidated damages of 25 percent of the unpaid minimum wage and overtime. *Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 143 (2d Cir. 2013). After that date, liquidated damages were increased to 100 percent of the total unpaid wages. *Id.*[11]

---

[11] Although unpaid spread-of-hours wages are also subject to liquidated damages, Judge DeArcy Hall already awarded those damages in her prior order. *See* ECF No. 118 at 7–8.

Azoulay did not have a good-faith basis for failing to pay minimum wage and overtime. "[T]he first time [Azoulay] knew anything about the FLSA" was at his "deposition." Azoulay 428:13-19. He was "not sure" he was generally familiar with the requirements of the NYLL. *Id.* at 639:8-10. Azoulay's professed "ignorance of the prevailing law" is not a good-faith basis. *Garcia*, 2015 WL 4940107, at *6. Accordingly, the plaintiffs are awarded liquidated damages in the amounts specified by the New York law just recited.

c. Prejudgment Interest

Plaintiffs are also entitled to prejudgment interest for violations of the NYLL. N.Y. C.P.L.R. § 5001(a); NYLL § 663(1); *Reilly v. NatWest Mkts. Grp. Inc.*, 181 F.3d 253, 265 (2d Cir. 1999). "[T]he NYLL permits the award of both liquidated damages and pre-judgment interest" on unpaid wages. *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 48 (E.D.N.Y. 2015). "This dual availability occurs because New York State views liquidated damages as punitive, and not compensatory, such that pre-judgment interest is not a duplicative damages award." *Id.*

"Prejudgment interest is calculated on the unpaid wages due under the NYLL, not on the liquidated damages awarded under the state law." *Id.* The amount of interest is nine percent simple interest, calculated on Plaintiffs' claims for

unpaid wages and appropriation of gratuities under the New York Labor Law.  N.Y. C.P.L.R. § 5004.  When damages occur at different times, it is proper to utilize "a single reasonable intermediate date."  *Id.* § 5001(b).  Courts awarding interest for NYLL violations use the "midpoint of the accrual of . . . damages to calculate interest."  *Doo Nam Yang*, 427 F. Supp. 2d at 342.

In their damages calculations, plaintiffs generally calculate prejudgment interest using the midpoint of each year — that is, July 2 — as the beginning date and the date of judgment as the end date.[12]  These are reasonable assumptions, and they are appropriate here given the voluminous calculations that would otherwise be involved.

The plaintiffs are awarded both liquidated damages and prejudgment interest.

d.   Calculation of Underpayment

To demonstrate the amount of underpayment here, the plaintiffs called Thomas Power, an attorney who previously represented the plaintiffs in this litigation, as their last witness.  Power described his process for transcribing Azoulay's, Vazquez's, and Torres's handwritten records and

---

[12] The midpoint is different for Vazquez, Bacilio, and Torres for 2014, and Gonzalez for 2013, when those plaintiffs worked only part of the year.

calculating Azoulay's alleged minimum wage and overtime liability using a spreadsheet.  *See* Power 359:9–412:20.

Following trial, the plaintiffs submitted a revised spreadsheet that corrected certain transcription and calculation errors.  *See* Pls.' Letter 1, ECF No. 209.  Several assumptions underlying that calculation have been rejected in this Order. The court has recalculated the damages owed by modifying the plaintiffs' proffered spreadsheet to comport with this Order.

2.   Damages for Retaliation

Plaintiffs seek only monetary damages on their retaliation claims.

a.   Compensatory Damages Under the FLSA

A plaintiff who prevails on a FLSA retaliation claim is entitled to recover back pay, liquidated damages, emotional distress damages, and punitive damages.  *Greathouse v. JHS Sec. Inc.*, No. 11-CV-7845, 2015 WL 7142850, at *3–6 (S.D.N.Y. Nov. 13, 2015), *R&R adopted*, 2016 WL 4523855 (S.D.N.Y. Aug. 29, 2016).

There is no evidence that the retaliation here resulted in any additional withheld wages.  There is thus no need to award back pay.  Moreover, "[t]he language of the FLSA limits liquidated damages to the amount of any payment of wages lost."  *Greathouse*, 2015 WL 7142850, at *4.  Because Plaintiffs

are not entitled to back pay, they are also not entitled to liquidated damages under the FLSA.

An award of emotional distress damages is inappropriate because there is no evidence that any plaintiff suffered emotional distress. *See id.*

I also do not award punitive damages. Assuming that such damages are available under the FLSA, *see id.* at *5, (collecting cases so holding), an award of punitive damages under the FLSA would be duplicative of the liquidated damages award under the NYLL below.

b.   Compensatory Damages Under the NYLL

A plaintiff who prevails on an NYLL retaliation claim is entitled to recover back pay, liquidated damages, and emotional distress damages. *Nana v. Le Viking LLC*, No. 17-CV-928, 2019 WL 3244181, at *5 (S.D.N.Y. July 19, 2019), *R&R adopted* (Oct. 28, 2019).

For the same reasons as above, the plaintiffs are not entitled to an award of back pay or emotional distress damages. However, the NYLL "permits liquidated damages in an amount up to $20,000 for retaliation claims." *See id.; see also* NYLL § 215(2)(a). "[L]iquidated damages under the anti-retaliation provisions of the NYLL are . . . punitive in nature, given that they flow from a willful retaliatory act." *Belizaire v. RAV Investigative & Sec. Servs. Ltd.*, 61 F. Supp. 3d 336, 364

(S.D.N.Y. 2014).  A liquidated damages award is thus warranted here.

As to the amount of such damages, *Perez v. Jasper Trading, Inc.*, No. 05-CV-1725, 2007 WL 4441062, at *10 (E.D.N.Y. Dec. 17, 2007) is instructive.  There, Judge Glasser awarded $5,000 in punitive damages to plaintiffs where defendants "not only threatened the plaintiffs that they would be reported to immigration authorities," but "actually sought to interfere with the new employment found by the [plaintiffs] by making apparently unsupported allegations against their new employer to the Department of Labor."  *Id.*

Azoulay's retaliation here was less severe, and his penalty should be as well.  Although Azoulay did go to the IRS with the plaintiffs' information and at least threatened that he had reported all plaintiffs to the SSA, I have not found that he took further action against the plaintiffs.  Moreover, the record does not support that either Azoulay's 2015 complaint to the Attorney General or his conversation with the FBI — at which he says he never named the plaintiffs — put the plaintiffs at risk of further harm.

Thus, each plaintiff is awarded $3,000 in punitive damages.

3. <u>Attorney's Fees and Costs</u>

Both the FLSA and NYLL allow the award of attorney's fees and costs to a prevailing plaintiff.  29 U.S.C. § 216(b); NYLL § 663(1).  The plaintiffs may move for such an award.

### III.  Conclusion

Applying the methodologies discussed in the Order, and crediting the plaintiffs' representations that they have accurately transposed the data from physical records to their electronic submissions to the court, the plaintiffs are entitled to damages in the following amounts:

**Vazquez:**

| Unpaid Wages / Overtime | Misappropriated Gratuities | NYLL Liquidated Damages | Prejudgment Interest | NYLL Punitive Damages for Retaliation | **Total** |
|---|---|---|---|---|---|
| $9,150.79 | $6,706.17 | $9,460.39 | $18,680.57 | $3,000 | **$47,747.92** |

**Bacilio:**

| Unpaid Wages / Overtime | Misappropriated Gratuities | NYLL Liquidated Damages | Prejudgment Interest | NYLL Punitive Damages for Retaliation | **Total** |
|---|---|---|---|---|---|
| $18,754.28 | $5,103.45 | $10,334.78 | $30,183.33 | $3,000 | **$68,125.83** |

**Torres:**

| Unpaid Wages / Overtime | Misappropriated Gratuities | NYLL Liquidated Damages | Prejudgment Interest | NYLL Punitive Damages for Retaliation | **Total** |
|---|---|---|---|---|---|
| $18,784.79 | $5,867.07 | $10,796.54 | $30,984.00 | $3,000 | **$70,182.40** |

**Gonzalez:**

| Unpaid Wages / Overtime | Misappropriated Gratuities | NYLL Liquidated Damages | Prejudgment Interest | NYLL Punitive Damages for Retaliation | Total |
|---|---|---|---|---|---|
| $1,072.94 | $396.97 | $1,469.91 | $1,442.70 | $3,000 | **$8,132.52** |

In addition, the plaintiffs may move for an award of attorney's fees and costs under 29 U.S.C. § 216(b) and NYLL § 663(1) within 21 days of this order.

SO ORDERED.

_/s/ Eric Komitee_
ERIC KOMITEE
United States District Judge

Dated:     March 20, 2024
           Brooklyn, New York